NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0587n.06
Filed: August 16, 2006

No. 05-4355

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| WILLIAM JOHNSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF OHIO |
| UNITED STATES DEPARTMENT OF | ) | |
| LABOR, | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

**Before: GILMAN and SUTTON, Circuit Judges; and HOOD, District Judge.**[*]

**RONALD LEE GILMAN, Circuit Judge**. William Johnson appeals a decision of the

Department of Labor's Administrative Review Board (ARB) that found him liable for violations of

the McNamara-O'Hara Service Contract Act (SCA), 41 U.S.C. §§ 351-58, and barred him from

bidding on government contracts for a period of three years. Johnson was the president of Rasputin,

Inc., a company that provided security-guard services at a Navy base near Jacksonville, Florida

pursuant to a contract with the government. The Department of Labor (DOL) alleged, and an

administrative law judge (ALJ) and the ARB found, that Rasputin had failed to pay its employees

in accordance with the SCA and related regulations. Johnson was found to be "the party

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting
by designation.

responsible" for the SCA violations and was consequently barred from bidding on government contracts for a period of three years.

He challenged the administrative decision in the district court, arguing that (1) Rasputin did not in fact violate the SCA, (2) he was not the party responsible for Rasputin's actions, (3) unusual circumstances justified relieving him of the normal penalty of debarment, and (4) the Bankruptcy Code prohibited the DOL from debarring him because he had filed a bankruptcy petition before the DOL initiated proceedings against him. The district court, in a thorough and well-reasoned opinion, rejected each of these arguments and granted summary judgment in favor of the DOL. *Johnson v. U.S. Dept. of Labor*, No. 2:04-CV-0775, 2005 WL 1970742 (S.D. Ohio, Aug. 16, 2005). We fully agree with the district court's analysis and **AFFIRM** the judgment below on the strength of that court's opinion, adding our own supplemental thoughts regarding the latter three arguments raised by Johnson.

## I. THE PARTY RESPONSIBLE

The first of these arguments is that Johnson was not the party responsible for any statutory violations that Rasputin may have committed. Section 3(a) of the SCA, 41 U.S.C. § 352(a), imposes liability on "the party responsible" for violations of the Act. The regulation interpreting that term clarifies that it covers more than just the corporate officers "who actively direct[] and supervise[] the contract performance." 29 C.F.R. § 4.187(e)(1). Rather, "the party responsible" can be any "person[], irrespective of proprietary interest, who exercise[s] control, supervision, or management over the performance of the contract, including the labor policy or employment conditions regarding

the employees engaged in contract performance, and who, by action or inaction, cause[s] or permit[s] a contract to be breached." *Id.* § 4.187(e)(4). Johnson insists that he exercised no control over the operations or labor policy of Rasputin until becoming president in August of 1996, and therefore argues that he played no role in the SCA violations.

As the district court correctly noted, however, "the ALJ was tasked with determining whether the testimony of Wayne Stewart or William Johnson was more credible." *Johnson*, 2005 WL 1970742, at *8. Stewart, who was the operations manager for Rasputin's security contract and had worked with Johnson over many years on other government contracts, testified that Johnson (1) decided the wage rate at which employees would be paid, (2) made other payroll decisions, (3) had final authority on all equipment, (4) made employment decisions (including hiring Stewart and firing project manager Lee Holman), and (5) held himself out as the president of Rasputin both during the bidding process and during the DOL investigation in 1996.

Although Johnson conceded his role in securing the contract and getting operations up and running, he testified that he had nothing to do with the day-to-day operations of the company from the Fall of 1995 until he assumed the presidency of the company in August of 1996. Johnson instead deflected blame onto his brother Wallace, the person to whom Stewart allegedly reported. Outside of helping to secure the contract, lending Rasputin money at the outset, and giving initial advice on personnel matters, Johnson claims that he did not control Rasputin's operations until taking over as president.

Stated simply, the accounts given by Stewart and Johnson are irreconcilable. The determination of whether Johnson was "the party responsible" therefore turns on which one of the

two men was found more credible. This court, in reviewing administrative decisions both in and outside of the labor context, has consistently accorded substantial deference to the credibility determinations of the ALJ. *See, e.g.*, *NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514 (6th Cir.1998) ("We afford even more deference to Board determinations of credibility and will not normally set aside the Board's choice between conflicting testimony."); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (according "great deference" to an ALJ's credibility determination in assessing whether an applicant's claim of subjective pain was believable); *see also Dantran, Inc. v. U.S. Dep't of Labor*, 171 F.3d 58, 72 (1st Cir. 1999) (recognizing "a hearing officer's latitude in making credibility calls"). ALJs, after all, are the only judicial officers to see and hear the witnesses and to observe their overall demeanor during their testimony. *See NLRB v. Gen. Fabrications Corp.*, 222 F.3d 218, 225 (6th Cir. 2000) (reciting the rule that this court "ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor," especially "where the record is fraught with conflicting testimony and essential credibility determinations have been made") (citations and quotation marks omitted).

The record in the present case is indeed "fraught with conflicting testimony." *See id.* Johnson argues that this conflict should be resolved in his favor because Stewart had an interest in casting blame on Johnson in order to avoid debarment himself. The ALJ, ARB, and the district court all rejected this argument, reasoning that Stewart's self-interest was merely speculative because he had not been charged by the DOL, that Johnson did not specifically refute certain instances of supervisory control cited by Stewart, and that, had Stewart simply wanted to implicate someone else, he could have pointed to Wallace Johnson, with whom he did not have as extensive a relationship

as he had with William Johnson. Given the ALJ's ability to assess the credibility of Johnson and Stewart, we see no basis for overturning either the legal conclusion that Johnson was "the party responsible" or the ALJ's factual findings underlying that determination.

Evidence that Johnson points to as corroborating his version of events does not alter our conclusion. Specifically, Johnson relies on the testimony of Darlene Ford, as well as on the asserted absence of testimony backing up Stewart's account, to argue that his version of events is more accurate. Ford was the manager of Rasputin's Ohio office and also worked for Plum Run, a company owned and operated by Johnson. She testified that she worked directly for Stewart, that Stewart signed the payroll checks, and that she knew of only two officers of the company, neither of whom was Johnson. According to Johnson, Ford is an independent source who refutes Stewart's description of Johnson's responsibilities at Rasputin.

We agree with the district court, however, that the ALJ and the ARB did not clearly err in refusing to credit Ford's testimony. For one thing, Ford may not have been "completely independent." She worked directly for Plum Run, a separate company owned by Johnson and operated out of an office adjacent to that of Rasputin. Ford thus had an interest in casting Johnson's actions in the light most favorable to him. In addition, Ford's testimony is inconsistent with other evidence in the record. As the district court ably explained, Ford testified that Stewart handled *all* matters having to do with payroll, workers compensation, and conflicts with the DOL. This would mean that Stewart acted unilaterally on the most important legal and financial questions affecting Rasputin, despite Ford's acknowledgment that Stewart was not an officer of the company. That

Rasputin would structure itself in this way strains credulity and provides ample reason for the ALJ to have discounted the credibility of Ford's testimony.

## II.  UNUSUAL CIRCUMSTANCES

Johnson next challenges the ARB's conclusion that he failed to demonstrate unusual circumstances that would entitle him to relief from the ordinary remedy of debarment.  A contractor that violates the SCA is debarred for a period of three years unless the contractor can demonstrate "unusual circumstances."  41 U.S.C. § 354(a).  The term is not defined in the SCA.  Governing regulations, however, establish criteria for determining whether unusual circumstances exist under the facts of individual cases.  *See* 29 C.F.R. § 4.188(b).  These criteria, as the First Circuit has explained, can be broken down into a three-part inquiry:

> Part I asks whether the contractor's violations were "willful, deliberate or of an aggravated nature" or the result of "culpable conduct such as culpable neglect to ascertain whether practices are [or were] in violation" or failure to comply with recordkeeping requirements.  29 C.F.R. § 4.188(B)(3)(i).  Part II calls for the following prerequisites to be present: a good compliance history, cooperation in the investigation, repayment of moneys due, and sufficient assurances of future compliance.  Finally, if the conditions in Part I and II are met, a number of factors are considered to determine whether "unusual circumstances" are present, bearing on good faith.

*Vigilantes, Inc. v. Adm'r, Wage and Hour Div.*, 968 F.2d 1412, 1418 (1st Cir. 1992) (alteration in original).  But relief should be granted only sparingly, given Congress's intent of making "debarment of contractors who violate[] the SCA . . . the norm, not the exception . . . ."  *Id.*  The burden of proof in showing unusual circumstances therefore rests with the contractor.  29 C.F.R. § 4.188(b)(1).

At the first step, the ALJ found that Johnson (and Rasputin) successfully rebutted the charge that they culpably neglected their obligations under the SCA because they had requested a wage determination from the DOL. But the ARB reversed this aspect of the ALJ's decision, concluding that the same evidence establishing Johnson as the responsible party also supported the conclusion that Johnson knew about the wage discussions with the DOL and still decided to pay the lower wage rate. Citing agency precedent holding that the commission of SCA violations after receiving guidance as to wage payments constituted "culpable neglect," the ARB held that the ALJ had erred in refusing to so characterize Johnson's conduct.

The ARB's conclusion at the first step of the unusual-circumstances test was not arbitrary, capricious, or otherwise contrary to law. *See Elaine's Cleaning Serv., Inc. v. U.S. Dep't of Labor*, 106 F.3d 726, 728 (6th Cir. 1997) (setting forth this standard of review). Accepting the factual finding that Johnson knew of the wage controversy, Stewart's efforts to ascertain the correct rate, and the response from the DOL, the ARB acted reasonably in concluding that Johnson's failure to correct the statutory violations constituted "culpable disregard" under 29 C.F.R. § 4.188(b)(3)(i). The ARB also cited an on-point administrative precedent that "held that commission of SCA violations after specific notice that a particular practice is in violation constitutes . . . culpable neglect." Because the ARB reasonably applied the governing regulations and case law to the facts, we agree with the district that there is no basis to overturn the conclusion that Johnson's behavior amounted to "culpable neglect."

## III. BANKRUPTCY CODE

This conclusion also closes the door on Johnson's remaining argument—namely, that the penalty of debarment is inconsistent with 11 U.S.C. § 525(a), which prohibits governmental units from denying, revoking, suspending, or refusing to grant "a license, permit, charter, franchise, or other similar grant . . . solely because [the debtor] is or has been a debtor under [the Bankruptcy Code] . . . or has not paid a debt that is dischargeable" in a bankruptcy filing. Johnson maintains that, because the ALJ found that he did not act culpably, the "sole" basis for the penalty of debarment is his failure to pay $173,460.34 in back wages and fringe benefits. As we have explained, however, the ARB reversed the ALJ's ruling on this point and explicitly held "that Johnson was guilty of culpable disregard of his SCA obligations." This means that the administrative decision to reject the claim of unusual circumstances and order debarment was not based "solely" on Johnson's failure to pay. The debarment order, therefore, does not fall within the plain language of § 525(a).

## IV. CONCLUSION

Because the reasoning that supports the summary judgment for the DOL has been clearly articulated by the district court, and because that opinion correctly resolves each of Johnson's challenges to the administrative ruling, the issuance by us of a more detailed opinion on any remaining issues would be unduly duplicative. The summary judgment order rendered by the Honorable Terence P. Kemp, Magistrate Judge of the United States District Court for the Southern District of Ohio, is accordingly **AFFIRMED**.